IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
Civil Action No. 1:23-cv-282

| | |
|---|---|
| JAMIE DEAN BURLESON,<br><br>  Plaintiff,<br><br>v.<br><br>TYLER R. MCDONALD, individually and in his official capacity as a former deputy of the Buncombe County Sheriff's Office; ANDREW DYLAN TAYLOR, individually and in his official capacity as a deputy of the Buncombe County Sheriff's Office; QUENTIN E. MILLER, in his official capacity as the Sheriff of Buncombe County; JACK VAN DUNCAN, in his official capacity as the former Sheriff of Buncombe County; and WESTERN SURETY COMPANY, Corporate Surety for the Sheriff,<br><br>  Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   **COMPLAINT**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>NATURE OF THE CASE</u>

1.  Plaintiff brings this action against the Defendants for compensatory and punitive damages pursuant to: a) 42 U.S.C. §§ 1983 and 1988; b) the Fourth and Fourteenth Amendments to the United States Constitution; c) the common law of North Carolina, for assault and battery, malicious prosecution, false imprisonment, and for willful, wanton and malicious conduct; and d) Article I, §§ 19 and 21 of the North Carolina Constitution.

## <u>PARTIES</u>

2.  Plaintiff Jamie Dean Burleson is and at all relevant times has been a citizen and resident of Buncombe County, North Carolina.

3.     Upon information and belief, Defendant Tyler R. McDonald (hereinafter, "McDonald") is and at all relevant times has been a citizen and resident of Buncombe County, North Carolina.  He was, at all relevant times, a licensed North Carolina law enforcement officer, employed by Buncombe County Sheriff Quentin Miller and former Sheriff Jack Van Duncan, and is being sued in his individual and official capacities.

4.     Upon information and belief, Defendant Andrew Dylan Taylor (hereinafter, "Taylor") is and at all relevant times has been a citizen and resident of Buncombe County, North Carolina.  He was, at all relevant times, a licensed North Carolina law enforcement officer, employed by Buncombe County Sheriff Quentin Miller and former Sheriff Jack Van Duncan, and is being sued in his individual and official capacities.

5.     Defendants McDonald and Taylor (collectively, the "Defendant deputies") are "persons" within the meaning of the Civil Rights Act of 1871, 42 U.S.C. § 1983, and have the capacity to be sued for the claims in this action.  At all times relevant hereto, the actions and omissions of the Defendant deputies that are the subject of this Complaint were undertaken while acting under color of state law, statute, ordinance, regulation, custom or usage.

6.     Defendant Sheriff Quentin E. Miller (hereinafter, "Sheriff Miller") is and at all relevant times has been the elected Sheriff of Buncombe County, and is being sued in his official capacity only.  Defendant Sheriff Miller is a "person" within the meaning of the Civil Rights Act of 1871, 42 U.S.C. § 1983, and has the capacity to be sued for the claims in this action.

7.     Defendant former Sheriff Jack Van Duncan (hereinafter, "former Sheriff Van Duncan") at all relevant times was the elected Sheriff of Buncombe County and is being sued in his official capacity only.  Defendant former Sheriff Van Duncan is a "person" within the meaning of the Civil Rights Act of 1871, 42 U.S.C. § 1983, and has the capacity to be sued for the claims in this action.

2

8.     Defendant Western Surety Company is sued as the Sheriff's surety under N.C.G.S. § 58-76-5.  Upon information and belief, it has issued the statutorily mandated surety bond to cover any injury caused by the neglect or misconduct of the Sheriff or those he employs.  Sheriff Miller is obligated under state law to obtain and maintain said surety bond and by doing so, waives governmental immunity as to the claims in this matter, at least to the extent of the bond.

9.     Upon information and belief, the County of Buncombe has obtained insurance coverage, pursuant to N.C.G.S. § 153A-435 or other applicable state law, that will indemnify Defendant Sheriff Miller, former Sheriff Van Duncan, Defendant McDonald and Defendant Taylor from the claims in this case and thereby has waived governmental and public officer immunity that each might claim.

## JURISDICTION AND VENUE

10.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of the Plaintiff's rights secured by the Fourth Amendment and Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

11.     The jurisdiction of this Court is further invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and the laws of the United States, particularly the Fourth Amendment and Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

12.     This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, since the claims form part of the same case and controversy arising under the United States Constitution and federal law.

3

13.     Venue is properly set in the Western District of North Carolina pursuant to 28 U.S.C. § 1391, as the causes of action alleged herein arise from events or omissions occurring in this district, and, upon information and belief, all of the Defendants reside in North Carolina and one or more of them resides in this district.

**FACTS**

14.     In the early morning hours of October 5th, the Plaintiff, a free citizen, was driving his green 2002 Chevy Silverado truck.

15.     The 2002 Chevy truck that the Plaintiff was driving was titled in his father's name – James Houston Burleson – but the Plaintiff used it as his own vehicle.  The truck had high mileage and a market value of less than $1,500.

16.     About three weeks prior, on September 13, 2020, the truck had been stolen after the Plaintiff had parked it on Patten Cove Road.

17.     The Plaintiff's father, James, reported the truck as being stolen to the Buncombe County Sheriff's Office ("BCSO").  A deputy sheriff, Mike Dixon, came to their house, where the Plaintiff lives, and a "BOLO" (Be-On-The-Lookout) was entered for the truck in the BCSO's computer records.

18.     Later that same day, on September 13, 2020, the truck was found and recovered. The Plaintiff's mother, Sandra, a retired employee of the Sheriff's office, called the BCSO and asked that the BOLO be removed.  Later that evening, Deputy Mike Dixon returned to the Burlesons' home and took Plaintiff's mother's report and said that he would remove the BOLO.

19.     About two weeks later, on September 29th or 30th, 2020, the Plaintiff was pulled over in the truck by a BCSO deputy.  As far as he knew, the Plaintiff was not violating any traffic laws and so he presumed that he had been stopped because of the BOLO on the truck.

4

20.     As the deputy approached, the Plaintiff put his arms out of the window with his driver's license in his hand and said: "This truck isn't stolen; it's mine. Here's my I.D."

21.     The deputy was courteous and professional. He checked out the ownership of the truck on his computer, and, upon confirming the Plaintiff's account, let the Plaintiff go on his way.

22.     About a week later, on October 5th, 2020, shortly after 3:00 a.m., the Plaintiff was again driving his 2002 Chevy truck, heading east on Tunnel Road/US-70, approaching Exit 55.

23.     The Plaintiff saw a sheriff's patrol vehicle drive out of a parking lot and start following him in a marked Ford Explorer.

24.     Although he was less than 1,000 feet from Burleson Road, where he lived, the Plaintiff pulled into the BP gas station parking lot, at 1411 Tunnel Road, before the deputy – Defendant Tyler McDonald – had turned his blue lights on.

25.     Although the convenience store was closed, the parking lot was well lit, with all of the lights on over the gas pumps.

26.     After he started following the Plaintiff, Defendant McDonald entered the license plate number – WXN5000 – into the BCSO's computer system and saw that there was an active BOLO on the truck as being stolen.

27.     The Plaintiff pulled past the compressed air station in the parking lot, and then reversed about 10 feet before stopping the truck. McDonald pulled up about 30 feet behind the Plaintiff's truck and immediately got out with his handgun drawn and started yelling: "Hands up! Hands up! Hands up!"

28.     About that same time, Defendant Andrew Taylor pulled up in a separate patrol vehicle and stopped just to the right and slightly behind McDonald's vehicle. McDonald was also driving a marked Ford Explorer.

5

29.     The Plaintiff had his driver's side window down and immediately tried to communicate with McDonald, telling him that the truck was his.

30.     McDonald responded: "I don't care!  Open the door!  Open the door!  Open the door!"

31.     The Plaintiff opened the door and stepped out of the truck and continued to try to explain the situation.  McDonald told him: "Turn around.  I don't care.  I'm not playing that game.  Turn around."

32.     The Plaintiff said: "What do you mean?  I just got pulled over . . . ," and McDonald cut him off and yelled: "Turn around!"  The Plaintiff was trying to explain that he had recently been pulled over because the BOLO had not been removed after his truck had been recovered.

33.     The Plaintiff turned around to face away from McDonald and said, again, that the truck belonged to him, and McDonald replied: "I'm not . . . I'm making sure."

34.     At that point, McDonald clearly understood that the Plaintiff was saying that the truck belonged to him.  He was "making sure" that the truck was not stolen.

35.     McDonald then said: "Put your hands up.  Back, back, back."

36.     The Plaintiff first put his hands up, but then thought McDonald was then telling him to put his hands behind his "back," and so put his hands behind his back, and turned around asking: "What, what . . . ?"

37.     McDonald, apparently realizing that his instructions were less than clear, then clarified: "Put your hands up!  Walk back.  Walk back.  Walk back."

38.     The Plaintiff complied and started walking backwards.  McDonald said: "Keep coming.  Keep coming."

39.     McDonald then holstered his handgun and approached the Plaintiff, saying: "Alright.  Keep your hands where I can . . . straight in the air."

6

40.     The Plaintiff, who had his driver's license in his right hand, then turned slightly to hand McDonald his driver's license, who reached out and accepted it.  The Plaintiff then said, struggling to explain: "Man, I just.  What . . .  It's . . . it's *my* truck."

41.     At that point, McDonald placed his right hand on the Plaintiff's left shoulder and said, with an irritated tone in his voice: "How am I supposed to know that when I run the tag?"

42.     The Plaintiff, who knew and recognized McDonald, said: "It's me!  It's me!  You know me!"

43.     The Plaintiff had gone to school with Tyler McDonald's father and had reason to believe that McDonald knew who he was, because:

a.     The Plaintiff's mother was a retired employee of the Sheriff's office;

b.     McDonald regularly parked his patrol vehicle in the parking lot of Affordable Dentures, which was directly across Tunnel Road from Burleson Road, the short road that he lived on, and McDonald had make eye contact with the Plaintiff on many occasions as he drove out of his neighborhood;

c.     The Plaintiff had been pulled over in the past by McDonald; and

d.     McDonald had taken the Plaintiff to jail once before, when the Plaintiff had a warrant for his arrest on a called-and-failed charge.

44.     McDonald then said: "Dude, you know what, if you're going to give me an attitude . . ." and removed metal handcuffs from his utility belt and reached for the Plaintiff's left arm without giving any verbal commands.

45.     The Plaintiff did not want to be placed in handcuffs because of previous injuries to his shoulders and it was painful to be placed in handcuffs.  He also knew what McDonald had done to his neighbor, Randall McMahan, as described below in the allegations supporting Plaintiff's Fourteenth Cause of Action.

7

46.     The Plaintiff pulled back and held his hands up saying: "Wait, listen man, please don't do this!  Please don't!"

47.     The Plaintiff was unarmed, said nothing that was threatening to McDonald or Taylor, and did nothing to threaten McDonald or Taylor.

48.     While the hour was late, the BP gas station parking lot was well lit and McDonald was not alone.  Taylor was there with is handgun drawn and pointed towards the Plaintiff.

49.     There was also nothing that the Plaintiff said or did to give either McDonald or Taylor any reason to believe he might try to flee.

50.     It was not necessary for McDonald or Taylor to place the Plaintiff in handcuffs to protect either of them or to prevent the Plaintiff from fleeing.

51.     There was no reason to believe that the Plaintiff was armed or dangerous and neither McDonald nor Taylor conducted a "pat-down" frisk for concealed weapons, which is some evidence of their state of mind.

52.     Also, neither McDonald nor Taylor said or did anything to determine if there was a passenger in the truck.  They did not ask the Plaintiff if anyone else was in the vehicle with him, and they did not look inside the truck to see if there was a passenger.

53.     McDonald then said: "You're not under arrest, you're . . . ," and began to forcibly place the Plaintiff in handcuffs.

54.     The Plaintiff had a right to resist being unnecessarily and unlawfully restrained in handcuffs by the Defendants during the investigatory stop.

55.     In fact, all free citizens of the United States have a constitutional right to resist an unlawful seizure by a law-enforcement officer in violation of the Fourth and Fourteenth Amendments.

56.     Taylor holstered his handgun, approached the Plaintiff, and immediately grabbed the Plaintiff's right arm and sweatshirt from behind.

57.     McDonald and Taylor then violently tackled the Plaintiff to the ground, as McDonald swept his legs out from under him.

58.     This action of the Defendants caused the Plaintiff to fall face down onto his hands and knees on the cement parking lot.

59.     The amount of force that McDonald and Taylor deployed in that moment did not reflect the gravity of the dangers presented. In fact, there was no danger to either of them.

60.     The Plaintiff was upset by this violent action of the Defendants and did not understand why he was being put in handcuffs.

61.     The Plaintiff pleaded with them: "What did I do? What did I do? What did I do? Why are you doing this to me? Why are you doing this to me?"

62.     McDonald said: "I'm trying to detain you!"

63.     And then, while the Defendant deputies continued to attempt to forcibly place the Plaintiff's arms behind his back, the Plaintiff again said: "Why are you doing this to me?"

64.     McDonald responded: "I'm detaining you, doofus!"

65.     The Plaintiff said: "I didn't do anything!"

66.     McDonald responded: "You're not under . . ."

67.     The Plaintiff said: "Ok, I'm not under arrest! . . . Please! Please!"

68.     The Plaintiff was afraid of being injured further by the deputies and maintained a position on all fours and resisted being placed in handcuffs, but did not strike or attempt to strike either deputy.

69.     At that point, McDonald began to strike the Plaintiff repeatedly on his lower left back torso with his right hand.

9

70. The Plaintiff also felt one of the deputies, which he believes to be Defendant Taylor, strike him on the side of his face.

71. McDonald then said: "Put your hands behind your back you idiot!"

72. The Plaintiff said: "Come on, guys! Come on, man!"

73. Taylor then spoke for the first time, and said: "Put your hands behind your back!"

74. McDonald and Taylor continued to try to forcibly place the Plaintiff in handcuffs behind his back while he was down on "all fours" on the cement parking lot.

75. McDonald then speared the Plaintiff in his left side torso with his knee at least two times, and said: "Stop! Geez! You fucking idiot!"

76. The Plaintiff, in a distressed voice, responded: "I'm not an idiot! I just was driving home, man!"

77. McDonald said: "Why don't you listen, stupid?!"

78. The Plaintiff said: "I'm not stupid! I was just driving home."

79. Taylor said: "Quit flexing!"

80. McDonald then struck the Plaintiff with this fist several more times in the same area of his lower left torso and said: "I'm about to taze you! I'm about to taze you!"

81. Taylor was then able to get his handcuffs on the Plaintiff's right-hand wrist and pull his right hand behind his back.

82. McDonald then connected Taylor's handcuffs to another set of cuffs that he had placed on the Plaintiff's left-hand wrist.

83. At that point, after the Plaintiff was fully handcuffed and he was lying face down on the concrete, McDonald violently speared the Plaintiff's lower left torso again with his knee using the full force of his body weight.

10

84.     McDonald then said, in an angry tone of voice: "You are under arrest!  Do you understand me?!"

85.     As a result of the actions of McDonald and Taylor, the Plaintiff suffered serious and painful injuries, including cuts and bruises to his forehead, bruised and swollen knees, and broken ribs on his back left side, where McDonald had repeatedly punched the Plaintiff and speared him with his knee, including once while he was lying face down on the concrete and his arms were cuffed behind his back.

86.     About that time, BCSO Deputy Amanda Michelle Owensby arrived to assist the Defendants.

87.     Shortly thereafter, the Plaintiff asked for the deputies to please loosen the handcuffs, which were hurting him, to which Taylor responded: "No!"

88.     Deputy Owensby then assisted the Plaintiff into a seated position, appropriately telling him what she was going to do and why she needed to do it.

89.     After the Plaintiff was helped into a seated position by Deputy Owensby, Taylor then loosened the handcuff on the Plaintiff's right-hand wrist.

90.     McDonald then approached the Plaintiff, leaned over and, calling the Plaintiff by his first name, started arguing: "Jamie.  Now that I know it's you.  I run your tag.  It says stolen."

91.     The Plaintiff said: "Yeah, but it . . ."

92.     McDonald cut him off mid-sentence and said: "How am I supposed to know that? It says stolen!"

93.     The Plaintiff said: "I was trying to tell you . . ."

94.     McDonald then said: "Ok, but I don't care!  I don't know if it's stolen or not.  When you, when I pull you over, you listen to an officer!  You don't turn around and ignore me.  You want to run your mouth.  I tried to detain you."

11

95.    The Plaintiff said: "I was trying to talk to you."

96.    McDonald said: "Ok, but I'm in control here, not you! Do you understand? How old are you? 47? Do you not understand this by now? You're under arrest for assaulting a government official!"

97.    The Plaintiff said: "I didn't assault nobody."

98.    McDonald said: "You did. You did."

99.    The Plaintiff said: "I never touched you."

100.    McDonald then said, pointing his finger at the Plaintiff: "You're bad. Don't talk to me."

101.    McDonald continued to scold the Plaintiff, as he sat in handcuffs on the concrete parking lot, with broken ribs and blood running down his face.

102.    McDonald said: "Unbelievable! You could have given me two seconds, and I'd have figured it out. And yet you wanted to be a fifteen year-old."

103.    The Plaintiff said: "A fifteen year-old?"

104.    McDonald said: "You're a fucking baby."

105.    At the request of Deputy Owensby, Defendant Taylor called Buncombe County EMS to assist the Plaintiff.

106.    The Plaintiff refused medical treatment at that time, but several hours later sought medical treatment at the Mission Hospital Emergency Department.

107.    McDonald informed Sergeant Chad Walker, who had arrived to the scene, that the vehicle had been recovered and it was not stolen.

108.    The Plaintiff was taken by McDonald to the Magistrate's Office at the Buncombe County Detention Center, where he was charged with resisting, delaying or obstructing a public officer in performance of his official duties, in alleged violation of N.C.G.S. § 14-223.

12

109.    McDonald apparently swore under oath to the Criminal Magistrate that the Plaintiff had willfully resisted, delayed and obstructed him by "not following [his] commands to place his hands behind his back."

110.    McDonald's statements to the Criminal Magistrate were false because McDonald never gave the Plaintiff a command to put his hands behind his back before he attempted to forcibly place the Plaintiff in handcuffs and tackled him to the ground using a leg sweep, with Defendant Taylor's assistance, after stating: "Dude, you know what, if you're going to give me an attitude . . ."

111.    While they were at the Detention Center and the Plaintiff was being booked and his mug shot taken, McDonald was apologetic and told the Plaintiff: "If this comes to court, I'll make sure it gets dismissed, as long as there are no lawyers, no cameras, no news."

112.    McDonald also had the Plaintiff's truck towed to an impoundment facility, and then teased the Plaintiff about it, saying: "You've lost your truck now."

113.    After being released by the Criminal Magistrate on a written promise to appear, the Plaintiff walked down College Street and down Tunnel Road to the Waffle House.  He arrived shortly before 6:00 a.m. and was suffering great pain and asked for an ambulance to be called for him.  An ambulance was called and arrived about 10 minutes later and transported him to the Mission Hospital Emergency Department where he received medical treatment.

114.    Three days later, on October 8, 2020, Assistant District Attorney Meredith Pressley voluntarily dismissed the misdemeanor charge against the Plaintiff of resisting a public officer, in Case No. 20 CR 089630.

115.    As a consequence of the Defendants' wrongful acts described herein, including the Defendants' unnecessary forcible handcuffing of the Plaintiff and the Defendants' use of excessive and unreasonable force during an investigatory stop, the Plaintiff suffered painful bodily injuries, humiliation, emotional distress, and medical expenses.

13

## FIRST CAUSE OF ACTION
## VIOLATION OF FEDERAL CIVIL RIGHTS

116.    Plaintiff re-alleges and incorporates by reference each and all of the preceding allegations of this Complaint as if fully set forth herein.

117.    In committing the acts alleged herein, the Defendants acted under color of state law to deprive the Plaintiff of certain constitutionally protected rights under the Fourth and Fourteenth Amendments to the Constitution of the United States including, but not limited to:

a.    the right to be free from unreasonable searches and seizures;

b.    the right to not be deprived of liberty without due process of law;

c.    the right to be free from unnecessary restraint during an investigatory stop;

d.    the right to be free from false arrest; and

e.    the right to be free from the excessive use of force.

118.    As a direct and proximate result of the violations of the Plaintiff's constitutional rights by the Defendants, the Plaintiff suffered general and special damages as alleged in this Complaint and is entitled to relief under 42 U.S.C. § 1983.

119.    The conduct of the Defendants was done with reckless or callous indifference to Plaintiff's federally-protected rights and of such a nature that punitive damages should be imposed in an amount commensurate with the wrongful acts alleged, under 42 U.S.C. § 1983.

## SECOND CAUSE OF ACTION
## UNNECESSARY PHYSICAL RESTRAINT DURING AN INVESTIGATORY STOP
## IN VIOLATION OF THE FOURTH AMENDMENT AND 42 U.S.C. § 1983

120.    Plaintiff re-alleges and incorporates by reference each and all of the preceding allegations of this Complaint as if fully set forth herein.

14

121.    The Plaintiff was restrained by the Defendant deputies with metal handcuffs during an investigatory stop when such restraint was unnecessary under the circumstances to protect the deputies or to prevent the Plaintiff from fleeing.

122.    Such conduct of the Defendant deputies constitutes a violation of the Plaintiff's rights under the Fourth Amendment of the Constitution of the United States.

123.    Plaintiff's right to be free from unnecessary physical restraint under the Fourth Amendment was sufficiently clear that a reasonable law enforcement officer in each of the Defendant deputies' position would have understood that what he was doing violated those rights.

124.    The Defendant deputies' violation of Plaintiff's rights under the Fourth Amendment and 42 U.S.C. § 1983 directly and proximately caused the Plaintiff to suffer painful physical injuries, emotional distress, and medical expenses.

125.    The Plaintiff also seeks and is entitled to punitive damages from the Defendant deputies in their individual capacities, as allowed under 42 U.S.C. § 1983, due to their deliberate indifference and callous disregard of Plaintiff's federally-protected rights.

### THIRD CAUSE OF ACTION
### USE OF EXCESSIVE AND UNREASONABLE FORCE IN VIOLATION OF THE FOURTH AMENDMENT AND 42 U.S.C. § 1983

126.    Plaintiff re-alleges and incorporates by reference each and all of the preceding allegations of this Complaint as if fully set forth herein.

127.    "The Fourth Amendment governs claims of excessive force during the course of an arrest, investigatory stop, or other 'seizure' of a person." *Riley v. Dorton*, 115 F.3d 1159, 1161 (4th Cir. 1997) (en banc).

128.    Plaintiff was seized and detained by the Defendant deputies during an investigatory stop, who exerted physical control over him through means intentionally applied, including tackling him to the ground and binding his arms together behind his back with handcuffs.

15

129.    In the course of seizing and detaining the Plaintiff, the Defendant deputies unnecessarily and maliciously injured the Plaintiff.

130.    The force used by the Defendant deputies to subdue the Plaintiff was excessive and unreasonable under the circumstances, in violation of the Plaintiff's rights under the Fourth Amendment of the Constitution of the United States.

131.    Plaintiff's rights under the Fourth Amendment were sufficiently clear that a reasonable law enforcement officer in each of the Defendant deputies' position would have understood that what he was doing violated those rights.

132.    The Defendant deputies' violation of the Plaintiff's rights under the Fourth Amendment and 42 U.S.C. § 1983 directly and proximately caused the Plaintiff to suffer painful physical injuries, humiliation, emotional distress, and medical expenses.

133.    The Plaintiff also seeks and is entitled to punitive damages from the Defendant deputies in their individual capacities, as allowed under 42 U.S.C. § 1983, due to their deliberate indifference and callous disregard of Plaintiff's federally-protected rights.

### FOURTH CAUSE OF ACTION
### FALSE ARREST IN VIOLATION OF THE
### FOURTH AMENDMENT AND 42 U.S.C. § 1983

134.    Plaintiff re-alleges and incorporates by reference each and all of the preceding allegations of this Complaint as if fully set forth herein.

135.    The Defendant deputies had no probable cause to arrest the Plaintiff, as there was insufficient evidence known to either of them to warrant the belief of a reasonable officer in the Defendants' position that a criminal offense had been or was being committed by the Plaintiff.

136.    The Plaintiff never assaulted either of the Defendant deputies or failed to follow a command, but lawfully resisted the Defendants' unlawful restraint of his liberty and lawfully resisted their excessive use of force during the investigatory stop.

16

137.    The Defendant deputies' unlawful arrest of the Plaintiff was done under color of state law and violated his constitutionally protected rights under the Fourth and Fourteenth Amendments to the Constitution of the United States, including his right to be free from unreasonable seizures and his right to not be deprived of liberty without due process of law.

138.    The Plaintiff's right not to be arrested without a lawful basis was sufficiently clear that a reasonable police officer in the Defendant deputies' position would have understood that what they were doing violated the Plaintiff's rights.

139.    The criminal proceeding brought against the Plaintiff in connection with his unlawful arrest terminated in the Plaintiff's favor – it was dismissed by an Assistant District Attorney within a few days after the charge was filed.

140.    The Defendant deputies' unlawful arrest of the Plaintiff in violation of his federal constitutional rights and 42 U.S.C. § 1983 directly and proximately caused the Plaintiff to suffer compensatory damages, including loss of liberty, humiliation, and emotional distress.

141.    In addition, the Defendant deputies' actions constituting unlawful arrest of the Plaintiff were done with reckless or callous indifference to Plaintiff's federally-protected rights and of such a nature that punitive damages should be imposed on the Defendants in an amount commensurate with the wrongful acts alleged herein under 42 U.S.C. § 1983.

## FIFTH CAUSE OF ACTION
### ASSAULT AND BATTERY

142.    Plaintiff re-alleges and incorporates by reference each and all of the preceding allegations of this Complaint as if fully set forth herein.

143.    The Defendant deputies' actions intended to cause, and did cause, the Plaintiff to reasonably apprehend the imminent threat of injury by the Defendants under circumstances indicating that they had the ability to inflict such injury.

17

144.     The Defendant deputies also acted for the purpose of causing harmful or offensive contact with the Plaintiff, without a lawful purpose, when they knew or reasonably should have known that such contact was substantially certain to result from their conduct.

145.     The Defendant deputies also acted in reckless disregard as to whether his actions would cause harmful or offensive contact with the Plaintiff, when they knew or reasonably should have known that such contact was substantially certain to result from their conduct.

146.     The Defendant deputies' actions in threatening imminent injury and causing harmful or offensive contact with the Plaintiff was done without justification, as the Plaintiff was at all times unarmed and did not pose a threat to either of the Defendants.

147.     Such conduct by the Defendant deputies constitutes assault and battery under the common law of North Carolina, which directly and proximately caused the Plaintiff to suffer painful physical injuries, humiliation, emotional distress, and medical expenses.

148.     Such conduct by the Defendant deputies was willful, wanton, and malicious, which pierces the veil of public official immunity.

149.     Such conduct by the Defendant deputies in violation of North Carolina law are imputed to the Defendant Sheriff under the doctrine of respondeat superior.

150.     In addition, the Defendant deputies' actions were of such a nature that punitive damages should be imposed on these Defendants in an amount commensurate with the wrongful acts alleged herein, under Chapter 1D of the North Carolina General Statutes.

**SIXTH CAUSE OF ACTION**
**MALICIOUS USE OF FORCE**

151.     Plaintiff re-alleges and incorporates by reference each and all of the preceding allegations of this Complaint as if fully set forth herein.

152. The Defendant deputies' actions were done willfully, wantonly, contrary to a duty of conduct imposed by law, and were intended to be injurious to the Plaintiff.

153. The Defendant deputies' actions were so reckless, or so manifestly indifferent to the consequences, as to justify a finding of willfulness and wantonness equivalent in spirit to an actual intent.

154. Such conduct by the Defendant deputies constitutes malicious use of force under the common law of North Carolina, which directly and proximately caused the Plaintiff to suffer painful physical injuries, humiliation, emotional distress, and medical expenses.

155. Such conduct by the Defendant deputies pierces the veil of public official immunity and is imputed to Defendant Sheriff Miller under the doctrine of respondeat superior.

156. In addition, such actions by the Defendant deputies were of such a nature that punitive damages should be imposed on these Defendants in an amount commensurate with the wrongful acts alleged herein, under Chapter 1D of the North Carolina General Statutes.

## SEVENTH CAUSE OF ACTION
### MALICIOUS PROSECUTION

157. Plaintiff re-alleges and incorporates by reference each and all of the preceding allegations of this Complaint as if fully set forth herein.

158. Defendant McDonald wrongfully instituted, procured, or participated in causing criminal proceedings to be brought against the Plaintiff, based on false evidence and without probable cause.

159. There was insufficient evidence known to Defendant McDonald to warrant the belief of a reasonable deputy in his position that a criminal offense had been committed by the Plaintiff.

19

160.    Until the point that the Defendant deputies grabbed, tripped, and forcibly tackled the Plaintiff to the ground, the Plaintiff did not fail to follow any lawful command of either of them.

161.    It is well-established under North Carolina law that: "[M]erely remonstrating with an officer . . . or criticizing or questioning an officer while he is performing his duty, when done in an orderly manner, does not amount to obstructing or delaying an officer in the performance of his duties." *State v. Leigh*, 278 N.C. 243, 251 (1971).

162.    After the Defendant deputies grabbed, tripped, and forcibly tackled the Plaintiff to the ground, he lawfully resisted their unlawful restraint of his liberty and lawfully resisted their excessive and unreasonable use of force.

163.    The actions of Defendant McDonald in charging the Plaintiff with a crime he did not commit were done maliciously, without excuse or just cause.

164.    The sole criminal charge of resist/obstruct/delay (N.C.G.S. § 143-223) that was brought against the Plaintiff was terminated in the Plaintiff's favor.

165.    Such actions by Defendant McDonald constitutes malicious prosecution under North Carolina law, which proximately caused Plaintiff to suffer compensatory damages, including humiliation and emotional distress.

166.    Such actions by Defendant McDondald is imputed to the Defendant Sheriff Miller under the doctrine of respondeat superior.

167.    In addition, such actions by Defendant McDonald was of such a nature that punitive damages should be imposed on Defendant McDonald in an amount commensurate with the wrongful acts alleged herein, under Chapter 1D of the North Carolina General Statutes.

20

## EIGHTH CAUSE OF ACTION
### FALSE IMPRISONMENT

168.     Plaintiff re-alleges and incorporates by reference each and all of the preceding allegations of this Complaint as if fully set forth herein.

169.     The Defendant deputies intentionally detained the Plaintiff in handcuffs against his will and caused him to be imprisoned – at the BP gas station, in the back of Defendant McDonald's police cruiser, and in the booking area of the Buncombe County Detention Center.

170.     These Defendants' detention of the Plaintiff was unlawful and not based on probable cause that any crime had been committed.

171.     Such actions by the Defendant deputies constitute false imprisonment under North Carolina law, which proximately caused the Plaintiff to suffer compensatory damages, including loss of liberty, humiliation, and emotional distress.

172.     Such conduct by these Defendants are imputed to Defendant Sheriff Miller under the doctrine of respondeat superior.

173.     In addition, such actions by these Defendants were of such a nature that punitive damages should be imposed on Defendants in an amount commensurate with the wrongful acts alleged herein, under Chapter 1D of the North Carolina General Statutes.

## NINTH CAUSE OF ACTION
### NEGLIGENCE BY THE DEFENDANT DEPUTIES

174.     Plaintiff re-alleges and incorporates by reference each and all of the preceding allegations of this Complaint as if fully set forth herein.

175.     Alternatively, even assuming that it was necessary to place the Plaintiff in handcuffs during the investigatory stop, the Defendant deputies still had a legal duty under North Carolina law to use only that amount of force reasonably necessary to do so.

176. The Defendant deputies breached their duty of care to the Plaintiff by tackling him to the ground, by using unreasonable and excessive force to place the Plaintiff in handcuffs, and by repeatedly hitting and kicking the Plaintiff.

177. The Defendant deputies' breach of their legal duty to the Plaintiff constitutes negligence and caused the Plaintiff to suffer compensatory damages in the form of painful physical injuries, humiliation, emotional distress, and medical expenses.

178. The actions of the Defendant deputies constituting negligence occurred while they were acting within the course of their employment by Defendant Sheriff Miller and are therefore imputed to Sheriff Miller under the doctrine of respondeat superior.

179. The Defendant deputies' liability for negligence is thus imputed to Defendant Sheriff Miller, in his official capacity, under the doctrine of respondeat superior.

180. As a direct and proximate result of the Defendant deputies' negligence, the Plaintiff suffered compensatory damages, including painful physical injuries, humiliation, emotional distress, and medical expenses.

## TENTH CAUSE OF ACTION
## NEGLIGENCE BY DEFENDANT SHERIFF MILLER

181. Plaintiff re-alleges and incorporates by reference each and all of the preceding allegations of this Complaint as if fully set forth herein.

182. Defendant Sheriff Miller, and his employees at the BCSO, had a duty to remove the BOLO from the Plaintiff's truck within a reasonable time after it was reported recovered by the Plaintiff's mother on September 13, 2020.

183. One or more of Defendant Sheriff Miller's employees at the BCSO knew that the truck had been recovered by its owner as of September 13, 2020.

184.    The BOLO on the truck had not been removed when the Plaintiff was first pulled over on September 29th or 30th, 2020, by a BCSO deputy.

185.    The BOLO on the truck had not been removed when the Plaintiff was pulled over a second time by Defendant McDonald on October 5, 2020.

186.    The failure of one or more of Defendant Sheriff Miller's employees to remove the BOLO on the truck within a reasonable time after September 13, 2020 constitutes negligence.

187.    On or about October 6, 2020, Sergeant Matt Howie from the BCSO came to Plaintiff's house and spoke with his mother, Sandra Burleson, for about 45 minutes. He told her that he would take care of the BOLO that had not been taken off the truck, which he did later that same day.

188.    But for the BOLO remaining on the 2002 Silverado truck, Plaintiff would not have been pulled over by Defendant McDonald on October 5, 2020, and he would not have been subjected to non-trivial violations of his constitutional rights and other related wrongful conduct by the Defendant deputies, as described above.

189.    As a direct and proximate result of the negligence of one or more of Defendant Sheriff Miller's employees in not removing the BOLO from the Plaintiff's truck within a reasonable time, the Plaintiff suffered compensatory damages, including painful physical injuries, humiliation, emotional distress, and medical expenses.

## ELEVENTH CAUSE OF ACTION
### ACTION UNDER THE BOND

190.    Plaintiff re-alleges and incorporates by reference each and all of the preceding allegations of this Complaint as if fully set forth herein.

191.    The actions of Defendant deputies described herein constitute neglect and malfeasance in their employment by Defendant Sheriff Miller and were taken under the auspices

of the Sheriff. As a proximate result, the Plaintiff suffered physical pain, humiliation, and emotional distress.

192. The negligence of Defendants McDonald and Taylor should be covered under the Bond, as these Defendants were acting under the authority of Defendant Sheriff Miller at all times.

193. Plaintiff brings this action for negligence on the Sheriff's Bond pursuant to N.C.G.S. § 58-76-5.

194. Plaintiff is entitled to recover on the Bond all of his damages proximately caused by the neglect and malfeasance of Defendants McDonald and Taylor. Such damages are in excess of $20,000.00. Plaintiff may sue repeatedly on the Bond until the judgment is paid.

## TWELFTH CAUSE OF ACTION
## VIOLATION OF STATE CONSTITUTIONAL RIGHTS

195. Plaintiff re-alleges and incorporates by reference each and all of the preceding allegations of this Complaint as if fully set forth herein.

196. As a direct and foreseeable result of the Defendants' actions, the Plaintiff was subjected to unreasonable and excessive use of force and was deprived of rights guaranteed to him under Article I, §§ 19 and 21 of the North Carolina Constitution.

197. As a direct and foreseeable result of the Defendants' actions in violation of his state constitutional rights, the Plaintiff suffered compensatory damages, including painful physical injuries, humiliation, emotional distress, and medical expenses.

198. Such actions by these Defendants were done willfully, wantonly, and maliciously and of such a nature that punitive damages should be imposed on Defendants in an amount commensurate with the wrongful acts alleged herein, under Chapter 1D of the North Carolina General Statutes.

24

199. Plaintiff pleads this cause of action against the Defendants in their official capacities as an alternative remedy, should any of Plaintiff's other state law claims be barred, in whole or in part, by principles of immunity.

### THIRTEENTH CAUSE OF ACTION
### VIOLATION OF CIVIL RIGHTS BY THE SHERIFF
### BASED ON FAILURE TO TRAIN

200. Plaintiff re-alleges and incorporates by reference each and all of the preceding allegations of this Complaint as if fully set forth herein.

201. The Plaintiff's important rights under the Fourth and Fourteenth Amendments were also violated by Defendant Sheriff Miller and Defendant former Sheriff Van Duncan due to their failure to adequately train the Defendant deputies.

202. Upon information and belief, Defendant McDonald and Defendant Taylor received inadequate training by Defendant Sheriff Miller and by former Sheriff Van Duncan regarding felony stop procedures, including, but not limited to, the importance of clear communication and under what circumstances the application of handcuffs is constitutionally permitted.

203. The Plaintiff's constitutional right not to be unnecessarily placed in handcuffs during an investigatory stop when: a) he was unarmed and communicative; b) there was no apparent danger to the officers; c) he was personally known to one of the officers; and d) there was no apparent risk of flight, was clear and well-established in the law, and deputies of the BCSO would be reasonably expected to confront such circumstances with some regularity.

204. Upon information and belief, Defendant McDonald and Defendant Taylor also received no or inadequate training by Defendant Sheriff Miller and by former Sheriff Van Duncan on de-escalation techniques, including, but not limited to:

a.   Respecting personal space;

b.   Using non-threatening non-verbal communication;

25

c.     Remaining calm, rational, and professional;

d.     Offering concise and respectful choices and consequences; and

e.     Allowing silence for reflection and decision-making.

205.    Defendant McDonald did the <u>opposite</u> of these well-known de-escalation techniques, which are taught to and used by law-enforcement officers throughout the country in connection with felony and other investigative stops, because:

a.     He quickly approached and put his hand on the Plaintiff's left shoulder, not respecting the Plaintiff's personal space;

b.     He immediately reached for the Plaintiff's left arm while simultaneously pulling his handcuffs from his belt, which was threatening non-verbal conduct;

c.     He began yelling unclear commands from the beginning and accused the Plaintiff of having an "attitude," instead of remaining calm, rational, and professional;

d.     He started to place the Plaintiff in handcuffs less than 20 seconds after the Plaintiff got out of his truck, rather than offering concise and respectful choices; and

e.     He repeatedly interrupted and spoke in a rude manner to the Plaintiff, rather than allowing silence for reflection and decision-making.

206.    The Defendant Sheriff Miller's and former Sheriff Van Duncan's failure to train Defendant McDonald and Defendant Taylor, and other deputies, in these vital areas manifests a deliberate indifference to the civil rights of the free citizens of Buncombe County and resulted in a violation of the Plaintiff's constitutional rights by the Defendant deputies.

207.    Such conduct of Defendant Sheriff Miller and former Sheriff Van Duncan constitutes a violation of Plaintiff's federal constitutional rights and 42 U.S.C. § 1983, which directly and proximately caused the Plaintiff to suffer compensatory damages, including painful physical injuries, loss of liberty, humiliation, emotional distress, and medical expenses.

26

## FOURTEENTH CAUSE OF ACTION
## VIOLATION OF CIVIL RIGHTS BY THE SHERIFF
## BASED ON A PERSISTENT AND WIDESPREAD PRACTICE
## OF EXCESSIVE USE OF FORCE

208.     Plaintiff re-alleges and incorporates by reference each and all of the preceding allegations of this Complaint as if fully set forth herein.

209.     The Plaintiff's rights under the Fourth and Fourteenth Amendments were also violated by Defendant Sheriff Miller and former Sheriff Van Duncan, upon information and belief, due to a persistent and widespread practice of permitting and condoning the excessive use of force by some BCSO deputies, including McDonald, as to constitute a custom or usage of the BCSO with the force of law.

210.     On or about October 12, 2017, several of the Plaintiff's neighbors, Randall and Nancy McMahan, were at the Citgo convenience store on Tunnel Road – across the street from the BP gas station – attempting to provide assistance to their adult son, who was suffering from a mental condition and causing a disturbance at the store.

211.     Upon their arrival, Mr. and Mrs. McMahan witnessed Defendant Tyler McDonald and several other BCSO deputies, including David Reed and Paul O'Connor, attempting to arrest their adult son, Ethan.

212.     When the BCSO deputies approached Ethan, he held out his hands, saying, "Let me give you my hands instead of your coming to get them."

213.     One of the deputies grabbed Ethan, slammed him onto the ground, and pushed his knee into Ethan's head.

214.     At about that time, Mr. McMahan spoke to the deputies and asked them not to cause any injury to his son.

27

215.    Several BSCO deputies then held Ethan down and shocked him with a stun gun multiple times.

216.    Mr. McMahan did not say or do anything to threaten any of the BCSO deputies and, in fact, held out his hands to submit, saying: "Take my hands."

217.    At that point, two of the deputies ran toward Mr. McMahan and grabbed him and threw him to the ground and assaulted him.

218.    Another of the BCSO deputies tackled Ethan's mother, Nancy McMahan, from behind, throwing her to the ground, while another deputy kicked her in the side and stomach.

219.    Another of the BCSO deputies jerked their minor son, Micah, out of their vehicle and caused a disturbance with respect to their minor son.

220.    Randall and Nancy McMahan, and both of their sons, were taken to the Buncombe County Detention Center.

221.    During Micah's transport to the Detention Center, he overheard one of the BCSO deputies say to another deputy: "Did you see me bulldog that bitch from behind and take her down?"

222.    Randall and Nancy McMahan were placed in the booking area of the Detention Center.  Nancy McMahan and their minor son, Micah, were placed on a bench outside of a cell, while Randall McMahan was placed in a holding cell.

223.    While Randall McMahan was sitting down inside the holding cell, Defendant Tyler McDonald, Derick Reed, and other BCSO deputies went into the cell and approached Mr. McMahan and told him they were going to give him an "attitude adjustment" and "assault therapy."

224.    Before entering Mr. McMahan's cell, Defendant Tyler McDonald, Derick Reed, and other BCSO deputies had dressed up in SWAT outfits, including tactical gloves, and turned off their body-worn cameras, but did not turn off the sound recording.

28

225.    Defendant Tyler McDonald, Derick Reed, and other BCSO deputies then proceeded to maliciously assault Mr. McMahan by kicking him and striking him with their fists in his jail cell, for at least two full minutes.

226.    After Defendant Tyler McDonald, Derick Reed and the other BCSO deputies walked out of the cell, two of them fist-bumped each other, which was captured on video.

227.    Randall and Nancy McMahan were charged with certain criminal offenses, including assault on a government official and resisting arrest.

228.    After they were held at the Detention Center overnight and posted a bond to be released pending trial, all of the charges against them were dismissed.

229.    Randall McMahan received medical treatment at Mission Hospital for the injuries he sustained during the beating in the jail cell.

230.    On October 11, 2019, Randall and Nancy McMahan commenced a civil action with the filing of a Verified Complaint against former Sheriff Van Duncan and several of his deputy sheriff's, including Defendant McDonald, being the case of *McMahan, et al. v. Van Duncan, et al.*, Buncombe County Superior Court, File No. 19 CV 4479.

231.    The McMahans' state court action was removed to the United States District Court for the Western District of North Carolina, as Case No. 1:19-cv-339-MOC-WCM, and was later resolved by a settlement agreement on December 9, 2020, under which Randall and Nancy McMahan were paid $167,500.00.

232.    After the settlement, Joel Burgess of the *Asheville Citizen-Times* reported that Randall McMahan said: "It could happen to anybody.  We are good people.  We work every day and pay our bills and are good parents."

233.    None of the defendant officers in the McMahans' civil case or the Sheriff's office admitted any wrongdoing in reaching the settlement with the McMahans.

29

234. Like the Plaintiff in the case at bar, Randall and Nancy McMahan did not assault or threaten Defendant Tyler McDonald or any of the other BCSO deputies who violently and maliciously assaulted and injured them.

235. Upon information and belief, Paul O'Connor received no discipline for his involvement with the assaults of Randall and Nancy McMahan on or about October 13, 2017, and Defendant McDonald and Derick Reed received only slight discipline – a two-day suspension – by the former Sheriff Van Duncan.

236. If Defendant McDonald was disciplined by the former Sheriff for this prior incident involving the McMahans, the discipline was not sufficient or effective.

237. A year later in 2018, upon information and belief, former Sheriff Van Duncan recognized Defendant McDonald as a "Deputy of The Year."

238. That positive recognition occurred in spite of his malicious assault of Randall McMahan at the Buncombe County jail, and despite his having only been a patrol deputy since August 2017.

239. By his actions, in his official capacity, former Sheriff Van Duncan encouraged, tolerated, ratified, and/or acquiesced to a dangerous environment of police brutality by failing to adequately punish unconstitutional uses of force by Defendant McDonald and other deputies.

240. In spite of Defendant Sheriff Miller's laudable new policy, announced on August 28, 2020, requiring his deputies and detention officers to "intercede to prevent the use of unreasonable force when in a position to do so," Defendant McDonald, who was 27-years-old, was in a leadership position with the BCSO on October 5, 2020, as the "Senior Officer" for the east and south side of Buncombe County.

30

241. As of October 5, 2020, the custom and practice of Buncombe County Sheriff's deputies, including Defendant McDonald, of the use of excessive and unreasonable force was ingrained in the culture of the BCSO.

242. Such conduct of Defendant Sheriff Miller and former Sheriff Van Duncan described herein constitutes a separate and distinct violation of Plaintiff's federal constitutional rights and 42 U.S.C. § 1983, which directly and proximately caused the Plaintiff to suffer compensatory damages, including painful physical injuries, loss of liberty, humiliation, emotional distress, and medical expenses.

## **PRAYER**

WHEREFORE, Plaintiff prays of the Court for the following relief:

1.  That this Court enter judgment declaring that Plaintiff's federal constitutional rights were violated by the Defendants, pursuant to 28 U.S.C. § 2201 – 2202.

2.  That Plaintiff recover compensatory and punitive damages from the Defendant deputies, jointly and severally, in their individual capacities pursuant to 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments for violation the Plaintiff's constitutional right to be free from unnecessary and unreasonable physical restraint during an investigatory stop.

3.  That Plaintiff recover compensatory and punitive damages from the Defendant deputies, jointly and severally, in their individual capacities pursuant to 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments for violation the Plaintiff's constitutional right to be free from excessive and unreasonable force.

4.  That Plaintiff recover compensatory and punitive damages from the Defendant deputies, jointly and severally, in their individual capacities pursuant to 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments for violation the Plaintiff's constitutional right to be free from false arrest.

5.  That Plaintiff recover compensatory and punitive damages from the Defendant deputies, jointly and severally, in their individual capacities based on his claim for assault and battery.

6.  That Plaintiff recover compensatory and punitive damages from the Defendant deputies, jointly and severally, in their individual capacities based on his claim for malicious use of force.

7.    That Plaintiff recover compensatory and punitive damages from Defendant McDonald, in his individual capacity, based on his claim for malicious prosecution.

8.    That Plaintiff recover compensatory and punitive damages from the Defendant deputies, jointly and severally, in their individual capacities based on his claim for false imprisonment.

9.    That the Plaintiff have and recover compensatory damages from the Defendant deputies, jointly and severally, in their individual capacities as a result of their negligence and/or against Defendant Sheriff Miller in his official capacity for his deputies' negligence and malfeasance pursuant to N.C.G.S. § 58-76-5.

10.   That the Plaintiff have and recover compensatory damages from the Defendant Sheriff Miller, in his official capacity, as a result of the negligence one or more of his employees in not removing the BOLO from the Plaintiff's truck within a reasonable time pursuant to N.C.G.S. § 58-76-5.

11.   That the Plaintiff have and recover compensatory damages from Defendant Sheriff Miller, in his official capacity, for any acts and/or omissions of the Defendant deputies in violation of North Carolina law for which either or both of them is found to be liable, as alleged herein, while acting in the course of their employment.

12.   That Plaintiff recover compensatory and punitive damages from the Defendants, jointly and severally, in their official capacities, based on his claim for violation of rights guaranteed to him under the North Carolina Constitution.

13.   That Plaintiff recover compensatory damages from Defendant Sheriff Miller and former Sheriff Van Duncan, in their official capacities, for failure to adequately train Defendant McDonald and Defendant Taylor in felony stop procedures, in violation of Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments, and 42 U.S.C. § 1983.

14.   That Plaintiff recover compensatory damages from Defendant Sheriff Miller and former Sheriff Van Duncan, in their official capacities, for a consistent and widespread practice of excessive and unreasonable force constituting a custom or usage with the force of law, in violation of Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments, and 42 U.S.C. § 1983.

15.   That Plaintiff be awarded his reasonable attorneys' fees pursuant to 42 U.S.C. § 1988(b), and as otherwise allowed by law.

16.   That Plaintiff be awarded his costs and expenses of this action.

17.   That pre-judgment interest and post-judgment interest on all monetary relief awarded to the Plaintiff be included in the judgment.

18.   For a jury trial on all issues so triable.

19.    For such other and further relief that the Court deems appropriate.

Respectfully submitted, this the 5th day of October, 2023.


s/ Stephen P. Agan
Stephen P. Agan
NC Bar No. 35763
Attorney for Plaintiffs
Hyler & Agan, PLLC
38 Orange Street
Asheville, NC 28801
Phone: (828) 254-1070
Facsimile: (828) 254-1071
E-mail: steve@hylerandagan.com


s/ George B. Hyler, Jr.
George B. Hyler, Jr.
NC Bar No. 5682
Attorney for Plaintiffs
Hyler & Agan, PLLC
38 Orange Street
Asheville, NC 28801
Phone: (828) 254-1070
Facsimile: (828) 254-1071
E-mail: george@hylerandagan.com